KSC/11.18.22



USDC- BALTIMORE
'22 DEC 15 PM 1:

Jeffrey J. Izant
Assistant United States Attorney
jeffrey.izant@usdoj.gov

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

36 South Charles Street
Suite 400
Baltimore, MD 21201-3119

DIRECT: 410-209-4982
MAIN: 410-209-4800
FAX: 410-962-0716

November 18, 2022

Christopher J. Purpura, Esq.
Law Office of Purpura & Purpura
8 East Mulberry Street
Baltimore, MD 21202
cpurpura@purpuralaw.com

**BY EMAIL**

Re: *United States v. Bryant Alphonso Warren,*
<u>Criminal No. ELH-20-0383</u>

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (the "Agreement") that has been offered to your client, Bryant Alphonso Warren (hereinafter the "Defendant"), by the United States Attorney's Office for the District of Maryland (the "Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5 p.m. on Friday, December 2, 2022**, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense of Conviction</u>

1. The Defendant agrees to waive indictment and plead guilty to Count One of a Superseding Information that will charge the Defendant with conspiracy to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846. The Defendant admits that the Defendant is, in fact, guilty of the offense, and will so advise the Court.

<u>Elements of the Offense</u>

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

**Count One: Conspiracy to Distribute and to Possess with Intent to Distribute a Controlled Substance**

a. That, during the period of time alleged in the Superseding Information, in the District of Maryland, the Eastern District of Pennsylvania, and elsewhere –

Rev. August 2018

i. Two or more people agreed to violate the Controlled Substances Act;

ii. The Defendant knew the unlawful purpose of the agreement;

iii. The Defendant joined the agreement willfully, that is, with the intent to further its unlawful purpose; and

iv. It was reasonably foreseeable to the Defendant that the agreement would involve the quantity of controlled substance alleged in Count One in the Superseding Information.

### Penalties

3. The maximum penalties provided by statute for each offense to which the Defendant is pleading guilty are as follows:

| Count(s) | Statute | Min. Prison | Max. Prison | Supervised Release | Max. Fine | Special Assessment |
|---|---|---|---|---|---|---|
| One | 21 U.S.C. §§ 846, 841(b)(1)(B)(ii)(II) | 5 years | 40 years | Min: 4 years Max: life | $5 million | 18 U.S.C. § 3013(a): $100 |

a. *Prison*: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. *Supervised Release*: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. *Restitution*: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. *Payment*: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. *Forfeiture*: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. *Collection of Debts*: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (i) the full amount of the fine or restitution is nonetheless due and owing immediately; (ii) the schedule of payments is merely a minimum

schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (iii) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that, by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. The Defendant has the right to have the charge presented to a Grand Jury, which would decide whether there is probable cause to return an indictment against the Defendant. By agreeing to proceed by way of Superseding Information, the Defendant is giving up that right, and understands that the charges will be filed by the United States Attorney without the Grand Jury.

    b. If the Defendant had pleaded not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    c. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    d. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    e. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    f.  If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed that would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    g.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" provisions below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    h.  If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced case, and the Court will find the Defendant guilty.

    i.  By pleading guilty, the Defendant also will be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that, if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

  5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551–3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991–98. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

  6.  This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

**Count One: Conspiracy to Distribute and to Possess with Intent to Distribute a Controlled Substance**

a. This Office and the Defendant stipulate and agree that, pursuant to United States Sentencing Guidelines ("U.S.S.G.") §2D1.1(c)(6), the applicable base offense level for Count One is **28** because the Defendant's offense involved at least 3.5 kilograms but less than 5 kilograms of cocaine.

b. A **2-level** increase applies, pursuant to U.S.S.G. §3B1.1(c), because the Defendant was an organizer, leader, manager, or supervisor in the criminal activity.

**Acceptance of Responsibility**

c. This Office does not oppose a **2-level** reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. §3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. §3E1.1(b) for an additional **1-**level decrease, in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. §3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offenses; (iii) gives conflicting statements about the Defendant's involvement in the offenses; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

**Rule 11(c)(1)(C) Plea**

9. The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that the imposition of a term of imprisonment of **72 months** (*i.e.*, **6 years**) in the custody of the Bureau of Prisons is the appropriate disposition of this case, taking into consideration the nature and circumstances of the offense, the Defendant's criminal history, and all of the other factors set forth in 18 U.S.C. § 3553(a).

10. This Agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of supervised release. In the event that the Court rejects this Agreement, except under the circumstances noted below, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that, if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor this Office will be bound by the specific sentence contained in this Agreement, and the Defendant will not be able to withdraw his plea.

## Obligations of the Parties

11. At the time of sentencing, this Office and the Defendant agree to request a term of imprisonment of **72 months (*i.e.*, 6 years)**. This Office reserves the right to advocate for a reasonable period of supervised release and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Second Superseding Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Forfeiture

12. The Defendant understands and agrees that, as a result of the Defendant's guilty plea, the Defendant will not be permitted to own, possess, or use a firearm or ammunition.

13. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

14. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities, including:

    a. Approximately $2,495.45 in United States currency seized from a bedroom in the Defendant's residence in Reisterstown, Maryland, on or about December 16, 2020; and

    b. Approximately $164,780.00 in United States currency seized from the basement in the Defendant's residence in Reisterstown, Maryland, on or about December 16, 2020.

15. The Defendant agrees to consent to the entry of such an Order of Forfeiture and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the

plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

16.     The Defendant agrees to assist fully in the forfeiture of any such property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

17.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Defendant's Conduct Prior to Sentencing and Breach

18.     Between now and the date of sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. §3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

19.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (a) this Office will be free from its obligations under this Agreement; (b) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C); and (c) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor this Office will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Waiver of Appeal

20. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent such challenges legally can be waived.

    b. If the Court imposes the agreed-upon term of imprisonment, the Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term or condition of supervised release, or order of forfeiture) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, or term or condition of supervised release).

21. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned case and agrees not to file any request for documents from this Office or any investigating agency.

### Public Benefits in Drug Cases

22. The Defendant understands and acknowledges that, under 21 U.S.C. §§ 862 and 862a, a person who has been convicted of a federal offense involving the distribution or possession of controlled substances may be denied certain federal and state benefits such as loans, grants, or food stamps.

### Consequences of Vacatur, Reversal, or Set-Aside

23. If a conviction entered pursuant to this Agreement is vacated, reversed, or set aside for any reason, then this Office will be released from its obligations under this Agreement, and any prosecution that is not time-barred as of the date of the signing of this Agreement (including any counts this Office has agreed to dismiss) may be commenced or reinstated against the Defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. The Defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date this Agreement is signed, and any applicable statute of limitations will be tolled from the date of this Agreement until 120 days after the vacatur, reversal, or set aside becomes final. The Defendant waives any defenses based on double jeopardy, pre-indictment delay, or the Speedy Trial Act.

### Court Not a Party

24. The Defendant expressly understands that the Court is not a party to this Agreement. In the federal system, the sentence is imposed by the Court, and the Court is under no obligation to accept this Agreement. In the event the Court rejects this Rule 11(c)(1)(C) plea agreement, pursuant to Rule 11(c)(5)(C) the Defendant will be informed that the Defendant may withdraw the plea. If the Defendant persists in the guilty plea thereafter, the Defendant understands that the disposition of the case may be less favorable than that contemplated by this Agreement. The Defendant understands that neither this Office, the Defendant's attorney, nor the Court can make a binding prediction or promise that the Court will accept this Agreement. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

25. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties, and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Sincerely,

Erek L. Barron
United States Attorney

By: _____
Jeffrey J. Izant
Assistant United States Attorney

Digitally signed by JEFFREY IZANT
Date: 2022.11.18 13:16:13 -05'00'

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

12/15/22
Date

Bryant Alphonso Warren

9

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement, with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

12-15-22
Date

_____
Christopher J. Purpura, Esq.

## ATTACHMENT A
## STATEMENT OF FACTS

*The undersigned parties stipulate and agree that, if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, **Bryant Alphonso WARREN**, 51 years old, was a resident of Reisterstown, Maryland. Beginning no later than May 2020, and continuing through December 2020, **WARREN** participated in a drug trafficking organization ("DTO") that was responsible for distributing large quantities of controlled substances, including cocaine, in and around Baltimore. Specifically, on at least three separate occasions, **WARREN** supplied cocaine to the DTO's leader, Ernest Lee BAILEY, from a source of cocaine supply in Philadelphia, Pennsylvania. BAILEY, in turn, recruited Coconspirator A and Individual 1 to transport the cocaine from Philadelphia to Baltimore on behalf of BAILEY and **WARREN**.

On May 26, 2020, at approximately 3:19 p.m., **WARREN** messaged BAILEY, "Waiting for the call." At 4:03 p.m., **WARREN** again messaged BAILEY, stating, "I'm going to need you at about 7." At 6:50 p.m., BAILEY responded, "What do u need me to do". At 7:09 p.m., **WARREN** directed BAILEY to meet him at an apartment in Owings Mills, Maryland. From there, **WARREN** and BAILEY drove to Philadelphia to acquire cocaine; and Coconspirator A and Individual 1 drove alongside **WARREN** and BAILEY in a separate car. At approximately 9:38 p.m., before the two cars returned to Baltimore, **WARREN** messaged BAILEY the address of a gas station in Owings Mills. Just after midnight on May 27, agents assigned to the Baltimore Organized Crime and Drug Enforcement Task Force ("OCDETF") Strike Force were conducting surveillance at the gas station when they saw the two cars park next to each other. Shortly thereafter, video surveillance captured **WARREN** entering and exiting the convenience store. At around the same time, agents saw BAILEY appear to retrieve something from the car used by Coconspirator A and Individual 1 and place it inside the car used by **WARREN** and BAILEY. Less than an hour later, a surveillance camera captured BAILEY carrying a light brown box into an apartment in downtown Baltimore that BAILEY used as a stash location.

On the night of July 13, 2020, **WARREN** and BAILEY again drove to and from Philadelphia to acquire cocaine. As during the prior trip, **WARREN** and BAILEY drove in one car while Coconspirator A and Individual 1 drove in a separate car. The two cars arrived in Philadelphia no later than 10 p.m. and returned to Baltimore by 12:22 a.m. on July 14. At that time, agents conducting surveillance saw the two cars pull into the same Owings Mills gas station and park next to each other. Shortly thereafter, video surveillance again captured **WARREN** entering and exiting the convenience store. Meanwhile, BAILEY appeared to retrieve something from the car used by Coconspirator A and Individual 1 and place it inside the car used by **WARREN** and BAILEY. After BAILEY and **WARREN** returned to their car, agents followed the car as it drove away from the gas station. Eventually, agents saw the car parked outside the same Owings Mills apartment where BAILEY met **WARREN** on May 26.

**WARREN** and BAILEY drove to and from Philadelphia to acquire cocaine yet again on July 25, 2020. By that point, Strike Force agents were—pursuant to a court order—intercepting

1

electronic and wire communications occurring over a cellphone that BAILEY used to communicate with Coconspirator A. At 4:19 p.m. [#629], BAILEY called Coconspirator A and told him to make sure that he was "gassed up so we can go straight" to Philadelphia and back. At 5:17 p.m. [#635], BAILEY sent Coconspirator A an address in Northwest Philadelphia. Three minutes later [#637], BAILEY called Coconspirator A to confirm that he saw the message. BAILEY added, "Yeah that's the address. Y'all can go ahead get in the car cause we getting ready to pull in [the] block." A few minutes later, agents saw Coconspirator A and Individual 1 get into Coconspirator A's car and begin driving to Philadelphia. Again, **WARREN** and BAILEY drove in a separate car alongside Coconspirator A and Individual 1.

At the address in Philadelphia, **WARREN**, BAILEY, Coconspirator A, and Individual 1 obtained a brown cardboard box that contained at least 2 kilograms of cocaine. Coconspirator A and Individual 1 then drove the box back to Baltimore, while **WARREN** and BAILEY drove in the separate car behind them. As BAILEY was driving with **WARREN**, BAILEY called Coconspirator B [#645], one of BAILEY's mid-level cocaine distributors. BAILEY told Coconspirator B that he was "getting ready to go see" the kilograms of cocaine that he and **WARREN** had just acquired. BAILEY stated that, while he might have acquired as many as three kilograms, "it's gonna be at least two." BAILEY reiterated that, with respect to each kilogram of cocaine, "Motherfuckers selling [at] 45, 46," referring to thousands of dollars. Nonetheless, BAILEY explained, "I ain't doing that to you. . . . I . . . give it to you what I get 'em for the 41, that's what you get 'em for and you just throw me what you can cause . . . you gotta make yours."

By 9:59 p.m., **WARREN**, BAILEY, Coconspirator A, and Individual 1 had arrived back at the gas station in Owings Mills. Again, a surveillance camera captured **WARREN** walking in and out of the convenience store. At about the same time, agents intercepted a call [#649] in which BAILEY asked Coconspirator A, "[Y]ou wanna grab the box and just put it in the back seat right here?" Coconspirator A responded, "Yeah, I can do that." An agent conducting surveillance then saw Coconspirator A get out of his car, open the trunk, and remove the brown cardboard box. Coconspirator A then carried the box to the car that **WARREN** and BAILEY were driving and placed it inside. Coconspirator A and Individual 1 then drove away.

After **WARREN** returned to the car with BAILEY, agents followed the car to the above-described apartment in Owings Mills. At approximately 10:17 p.m., an agent saw BAILEY walk away from the apartment, get into a different car, and drive away. At 10:43 p.m., BAILEY called Coconspirator B [#662] and told him, "I got the two for you, right . . . if you want to grab them it's up to you; if not, I'm gonna break these bitches down," meaning that BAILEY would repackage the kilograms of cocaine for further distribution. Coconspirator B responded, "Hell no, I'm taking them," and made plans to meet BAILEY to pick up the cocaine the next morning.

On November 16, 2020, Strike Force agents executed search warrants at BAILEY's residence and at BAILEY's stash apartment in downtown Baltimore. At the stash apartment, agents located digital scales, blenders, hydraulic presses, packaging materials, and more than 200 grams of controlled substances, including heroin, fentanyl, methamphetamine, and tramadol. At BAILEY's residence, agents located the cellphone that BAILEY used to communicate with **WARREN** and determined that BAILEY and **WARREN** had contacted each other nearly 1,900 times since May 1, 2020.

On December 16, 2020, agents executed a search warrant at **WARREN**'s residence in Reisterstown. **WARREN** was detained and advised of his *Miranda* rights, which he acknowledged understanding and waived verbally. Agents then briefed **WARREN** on the investigation they were conducting and explained that they knew that **WARREN** had been making trips to Philadelphia to acquire cocaine. In response, **WARREN** stated, "You guys got me."

When agents asked **WARREN** whether there were any valuables inside the residence, **WARREN** told them that there would be cash in a bedroom upstairs. Agents searched the bedroom and located approximately $2,495.45 in United States currency. Agents also searched the basement and, inside a large freezer, located approximately $164,780.00 in United States currency, which was bundled together in stacks. When agents asked **WARREN** about the large sum of money recovered from the basement freezer, **WARREN** told agents that they should just "leave it" there.

At a value of $41,000 per kilogram—the price at which **WARREN** was supplying cocaine to BAILEY, as BAILEY relayed to Coconspirator B—the currency seized from **WARREN**'s residence represented proceeds that he received from the sale of approximately 4 kilograms of cocaine. Accordingly, it was reasonably foreseeable to **WARREN** that the conspiracy he knowingly and willfully joined involved an agreement to distribute between at least 3.5 kilograms and 5 kilograms of cocaine, a Schedule II controlled substance.

SO STIPULATED:

Jeffrey J. Izant
Assistant United States Attorney

Bryant Alphonso Warren
Defendant

Christopher J. Purpura, Esq.
Counsel for Defendant

3